## Peter J. Trial v. The State.

### No. 4563.  Decided October 3, 1917.

### Rehearing granted June 28, 1918.

**1.—Wife and Child Abandonment—Justification—Charge of Court.**

Where, upon trial of wife and child abandonment, the evidence showed that at the time defendant married his wife she went under her maiden name and he was without knowledge that she had been previously married and divorced; that they were both members of the Catholic Church and he was informed by the ministers of that religion that the marriage was illegal; that her mother was a divorced woman and was engaged in the occupation of conducting an assignation house; and that defendant's wife frequently visited her mother, knowing the reputation of said house, and that defendant thereupon prepared to bring a divorce suit against her, etc., the court committed reversible error in withdrawing from the jury these facts, except as bearing upon the mitigation of punishment; instead of permitting the jury to determine whether such conduct on the part of the wife justified him in abandoning her. Prendergast, Judge, dissenting.

**2.—Same—Statutes Construed—Words and Phrases.**

The statute does not define the term "without justification." It manifestly leaves to the jury the determination of what facts will sustain the allegation that one wilfully and without justification deserts his wife, and the trial court was, therefore, not authorized to withdraw from the jury the facts recited and quoted in the court's charge, and thereby inhibit the use of them in determining whether defendant's desertion was wilful or without justification. Prendergast, Judge, dissenting.

3.—Same—Evidence—Wilful Desertion—Good Faith—Charge of Court.

Where, upon trial of wife abandonment, etc., the court admitted testimony that after the prosecution was instituted defendant made some propositions of compromise, in the way of having his father and others provide for his wife and child, but refused to let the details of said compromise go to the jury, the same was error; and this matter should have gone to the jury to determine the defendant's good faith, although defendant could not discharge his obligation to support his wife and child by providing that they could live upon the bounty of others. Following Irving v. State, 73 Texas Crim. Rep., 615, and other cases. Prendergast, Judge, dissenting.

Appeal from the County Court of Karnes. Tried below before the Hon. F. S. Schleicher, Special Judge.

Appeal from a conviction of wife and child abandonment; penalty, a fine of three hundred dollars and one day confinement in the county jail.

The opinion states the case.

*Bell & Brown* and *A. J. Bell,* for appellant.—On question of wilful desertion and necessitous circumstances: Verse v. State, recently decided; Moore v. State, 78 Texas Crim. Rep., 270, 180 S. W. Rep., 1100; Burton v. State, 77 Texas Crim. Rep., 314, 178 S. W. Rep., 219.

On question of justification: Potter v. United States, 15 U. S., 144; State v. Vandervough, 35 Fed. Rep., 352; State v. Rowe, 46 N. W. Rep., 872; Jeter v. State, 52 Texas Crim. Rep., 212, 106 S. W. Rep., 371; Caviness v. State, 60 S. W. Rep., 555; Duval v. Duval, 101 S. W. Rep., 521.

On question of wilful desertion: Barklay v. State, 12 S. W. Rep., 495; Waldstein v. State, 14 id., 394; Kemp v. State, 133 id., 869; Harroll v. Harroll, 42 id., 1040.

*E. B. Hendricks,* Assistant Attorney General, for the State.—On question of justification: Hamond v. Hamond, 74 Texas, 414.

PRENDERGAST, JUDGE.—The information based on the complaint is in two counts. One alleges that appellant on or about February 11, 1915, did unlawfully, wilfully and without justification, desert, neglect and refuse to provide for the support and maintenance of his wife, Ida Trial, who was then and there, and is at the date of filing this information, in destitute and necessitous circumstances. The second count alleges that on or about said date appellant did unlawfully, wilfully and without justification, desert, neglect and refuse to provide for the support and maintenance of his infant child six weeks old at the time of said desertion, said child then and there being in destitute and necessitous circumstances, alleging the name of the child.

Both counts were submitted for a finding by the jury. The evidence was unquestionably ample to sustain both. The jury returned a general verdict of guilty and fixed his punishment

The statute prescribing this offense is the Act of 1913, page 188, article 640a, Vernon's Criminal Statutes, to this effect: "That any husband who shall wilfully *or* without justification desert, neglect or refuse to provide for the support and maintenance of his wife who may be in destitute *or* necessitous circumstances; or any parent who shall wilfully *or* without justification desert, neglect or refuse to provide for the support and maintenance of his child under the age of sixteen years in destitute *or* necessitous circumstances, shall be deemed guilty, etc."

Attention is called to the fact that the desertion, etc., by the husband of his wife must be wilful *or* without justification, not wilful *and* without justification, and the same thing applies to the desertion, etc., of the parent of his child. Again, the statute does not require that the wife or child shall be both in destitute *and* necessitous circumstances but either in destitute *or* necessitous circumstances.

Appellant and his said wife were married some four years before he deserted her. They had lived together in harmony and peace all these years. She was an affectionate, true and faithful wife to him. She bore him two children; one a little boy about two and one-half years old and the other an infant girl six weeks old at the time he cruelly deserted her and his infant girl. They lived at Hobson, a small station on the Aransas Pass Railway, not far from San Antonio. Her home had been in San Antonio, where she married her husband, though prior to her marriage she had taught school at Hobson. Her parents lived in San Antonio. Her father and mother had been separated for some time. Her father owned a home in San Antonio and kept house with his two other unmarried daughters. Her mother, it seems, as one or two witnesses testified, had the reputation of being a prostitute and that she had kept assignation houses in San Antonio. During all of their married life, while living together, appellant and his wife visited her parents in San Antonio, staying sometimes with her father and at other times with her mother; generally with her father. She swore, and the evidence would undoubtedly justify the jury to find and believe, that if her mother was of the character indicated and kept such houses, that she did not know it and was not aware of it. Appellant, himself, shows that he never became aware of it until only less than about four months before he deserted his wife and infant child. Prior to the time they married, his wife had been married to another man, living with him only about ten days. She procured a divorce from him and had her maiden name restored to her long before she married appellant. He claimed he did not know that she had been previously married and divorced at the time he married her. He does not claim that she ever at any time represented to him that she had not been previously married and divorced. At most, his claim is that she did not affirmatively so tell him. On the other hand, she swore positively that she had fully told him before she married him about her previous marriage and divorce. The jury were clearly justified in finding and believing that.

she had so told him and that he knew it before he married her. He and his wife visited together and stayed with her mother some two days about the middle of October, 1914, just two months before the birth of their last child. With his consent she went to her father's to be confined when this child was born. He either went with her or visited her there both before and after the birth of this child. As soon as she was able after the birth of this child, she returned to their home in Hobson, from her father's, with both children. The little infant child became quite sick. It seems they had to send off to Karnes City, or some other place several miles away, for a physician to attend this infant. It getting no better she wanted to take it and the little boy to her father's in San Antonio so as to have physicians there treat the child, as it would be much more satisfactory and less expensive to them. He said he did not consent to this. She swore positively that he did and the circumstances show that he did consent. She took the children to her father's and had the baby treated there by a physician. She was gone then only four or five days. While there, needing badly a pair of shoes, she phoned to her husband for his consent to let her buy a pair of shoes, and as she had no money there to pay for them to have them sent by express C. O. D. He refused to let her buy the shoes. She then returned to her home in Hobson with her two children on or about February 11, 1915. He determined, as he swore, to desert her some two or three months before her last child was born, but he also swore that he never so told or intimated to her at any time. She swore that she had no idea that he intended or would desert her. Their home in Hobson was from a half to a mile from the railroad depot. When she reached there on said date she took her two children to her home. Finding the door locked she raised a window and went in. Soon afterward he approached the house but he did not go in to see either her or his little sick baby. He did not unlock the door. Through the window she handed to him the checks for her baggage, requesting him to go to the depot and bring it. He took the checks and promised to do so. His little boy at the time was out in the yard playing. He asked the child if he wanted to go with him. Of course he did and he took him. He went to, or toward the depot, met someone and sent the checks back to his wife. He did not take her baggage to her or have any other to do so. He immediately struck out with his little boy and went to his father's, who lived in the same town. When the messenger by whom, he had returned to her the checks delivered his message, she, for the first time, heard that he intended to desert her. She wanted to see him and talk the situation over with him, and for that purpose took her sick infant and went to his father's, where he then was, and was met by his father and refused admittance or an interview with her husband. Her husband, when she arrived at his father's, skipped out the back way with the little boy to his sister's. His father ordered her away. This was about night. She refused or declined to go. He then sent for an officer and had the officer to forcibly take her away to her home.

She was absolutely destitute of all food and of any funds with which to buy food. She then, for the first time, learned that on said date, February 11, 1915, appellant, over his signature, had had published in the local paper a notice that he "would not be responsible for any accounts contracted by her." She remained at her home two days, waiting and hoping to get to see him and talk the matter over. Her wait and hope were in vain. She was fed these two days by her kind neighbors. She had no money whatever and no means of getting any. She determined to return to her father in San Antonio and went to the depot to take the train for that purpose. At the depot a friend gave her three dollars to buy her ticket. Appellant's father or brother, one or the other, later sent her three dollars for this purpose. It seems she took that money and repaid the friend who had made the loan to her.

The complaint and information herein were filed February 25, 1915. This case was not tried until more than two years later, in March, 1917.

In his brief appellant frankly stated: "It would be folly to argue that the evidence is not complete and convincing that appellant did desert his wife"; but, he contends, that neither she nor his little baby were in either destitute or necessitous circumstances. His evidence even shows that his wife at the time he deserted her and his child had not a mouthful of provisions, and so far as he was concerned they would have starved but for the food furnished them at the time by kind neighbors. Her testimony establishes this positively and unequivocally. He claimed, however, that his father when trying to get her to leave his home offered to pay her hotel bill for one night if she would go there. Doubtless his and his father's intention was to have her leave Hobson as soon as possible. She swore she did not even have five cents in money, and all the evidence excludes the idea that she had any way to get any or to get any provisions. He had just published in the local paper a notice to the public that he would not be responsible for any accounts contracted by her.

He shows that he vigorously contested her application under the second section of said Act wherein she applied for an order from the judge of the lower court to require him to pay to her money for her support and that of her said child, the small sum of $30 per month. The whole testimony, without any doubt, showed at the time he deserted her and his infant child he did not provide any support for her or for his child. His contention further was that her father was able and willing to support and maintain her and her infant child, and for that reason she and her child were neither in necessitous or destitute circumstances.

Both in law and in morals the husband must support his wife and child, not only while he lives with them but also after he deserts them. Sec. 2, Act of 1913, p. 189, Vernon's Crim. Stats., art. 640b; Magee v. White, 23 Texas, 180; Callahan v. Patterson, 4 Texas, 61; 21 Cyc., 1151; Utsler v. State, 81 Texas Crim. Rep., 501; Pippins v. State, 79 Texas Crim. Rep., 525; Walters v. Neederstadt, 194 S. W. Rep., 514. The fact that someone else, even a near relative of the wife and baby, was able and

willing to support them and prevent them from suffering for lack of food and raiment would not, and could not, relieve appellant from his unquestioned duty and responsibility. The husband, and not someone else, is required both in law and in morals to support and maintain his wife and child. In the case of State v. Waller, 90 Kan., 829, 136 Pac. Rep., 215, which was quoted and approved by the Supreme Court of Tennessee in State v. Latham, 188 S. W. Rep., 534, it was correctly held as follows: "The duty of a husband to maintain his wife is * * * independent of the native disposition to generosity on the part of relatives, friends, and even strangers, which may be confidently relied on to protect a neglected woman from suffering and want. If a husband fail to provide his wife with the necessaries of life she is authorized to procure them on his credit if she can. Civil remedies exist whereby support may be compelled. But the duty is too often evaded in such a way that these measures are wholly inefficient. In view of this fact the Legislature undertook to provide a method and a sanction adequate to secure performance. The essence of the Act is that a man shall not be allowed to shift the burden of supporting his wife and children upon others under no obligation to bear it, and possibly upon the State itself. Therefore, whenever a husband, without just cause, neglects or refuses to provide for the support and maintenance of his wife, and thereby places her in such a situation that she stands in need of the necessaries of life, it is not material that they are supplied by her own labor or by sympathizing relatives, friends, or strangers, so that she does not in fact suffer from the privation. He is guilty if he leaves her in such circumstances that without her own efforts or outside help she would lack the necessaries of life."

Appellant has some bills of exceptions to the court's action in excluding some proffered testimony, which bills show this state of facts: In one he proposed to have his wife to testify and he himself to testify that about one month after this prosecution was begun he offered to have both of their children live with his father, who was amply able to care for and support them and who was willing to do so; and further, that his father would give and set aside sufficient property for the purpose of guaranteeing that his proposition would be carried out, and when the two children became twenty-one years of age his father would give each one of them $1000 cash. In another he offered testimony to the effect that about a year after this prosecution was begun his father, at his request, proposed that their two children should be placed in a Catholic school in San Antonio; the little boy at that time and the little girl when she was old enough to go to school, but to remain with its mother until put in school; that his father would keep them in the said school until they were of age or as long as they would stay, and when of age or the girl married would give each 100 acres of land; that his father would deed the land in trust to his brother, and if one child should die before maturity the survivor should get all the land, and if both died before maturity the land should revert to his father;

and in addition his father would give his wife $500, if necessary, with which she could go to school and brush herself up to teach school. In another he offered to prove that in January, 1917, nearly two years after the offense had been committed, he made some other proposition to her of what his father would do for his children, like the proposition just above stated.

The court permitted him to prove that on said several occasions he made some proposition to her about having the children taken care of by his father, which she declined, but upon objection of the State he at first refused to permit him to prove the details of said several propositions stated above. The court qualified these bills by stating that the attorneys for the State withdrew their objections to said testimony. He states, however, that when he is allowing and approving these bills with this qualification both appellant's and the State's attorneys are present and appellant's attorneys declare they did not understand that the State had withdrawn its objection and the court has no reason to believe they are not honest in their contention that they did not so understand the ruling of the court.

As stated, this prosecution was begun February 25, 1915, alleging the desertion by appellant of his wife and child while they were in destitute and necessitous circumstances on February 11, 1915. Under well established principles the offense thus charged would embrace the limitation period of two years before the information was filed, but under no circumstances could it embrace such an offense committed after the filing of the information. No prosecution can be had for any offense committed, or to be committed, in future. The offense must necessarily be a past offense. Neither can the accused, after prosecution is begun and after the crime has been committed, create a defense. The defense thereto must necessarily be limited to what occurred at the time of the commission of the offense or prior thereto. If there are any exceptions to these principles they do not occur to us now, nor could they be applicable herein.

It is proper to state further that practically simultaneously with appellant's desertion of his wife and child he filed a suit for divorce against her and sought to have the court in that case award the custody of both children to him and to take them away from his wife. This was contested by his wife. Doubtless all of these propositions by him were in view of the litigation between them over the custody of these children and not as any proposition to support them as he was both in law and morals bound to do, whoever had the custody of them. Surely no mother would be required as a condition precedent to her husband's support of their children to surrender her possession of them to anyone; to even her husband, much less his father. It certainly would be a horrible thing to require a mother to give up the possession of a six weeks old baby at her breast. No court would be expected to require or tolerate such an outrage. The principle held by the Court of Appeals of Missouri, in State v. Fuchs, 17 Mo. App., 460, is correct

and applicable here. In that case Fuchs was prosecuted for abandoning his wife without good cause and failing, neglecting and refusing to maintain and provide for her under a law substantially as ours in this particular. Fuchs offered testimony that some six weeks before the trial of the offense therein charged to have been committed, and only some twelve days after he deserted her, in substance, tending to show his wife had been intimate with another man after he deserted her. The State therein objected to such testimony and the court sustained the objection. Fuchs complained that this was error. The court held the objection was properly sustained, saying: "The information was filed October 25th and trial took place December 18th. This inquiry as to the wife's conduct was directed to the six weeks preceding the trial, and, therefore, to a time subsequent to the date of the filing of the information. If the State had a case when the information was filed it could not lose it by matter subsequent; if it had no case it could not get it by matter subsequent. . . . The fact that there was cause for the abandonment subsequent to the filing of the information does not tend to establish a case for the abandonment prior to such time. For this reason all testimony should have been limited to a time preceding the filing of the information."

In this case the fact, if·so, that appellant nearly two months after he had committed the offense charged herein then proposed to his wife that his father would support her infant child then at the breast only a few weeks old, if she would surrender her possession of it to his father, and that a year later he made somewhat the same proposition, was not and could not be any defense whatever to the crime he had already committed as denounced by the statute. The court should have excluded all this evidence. Not only the details, but the whole of it.

Appellant complains that the court refused to give some special charges which he requested. One of these was to the effect that if the jury believed he was a member of the Catholic church before he married and that his wife did not tell him that she had formerly been married and divorced, and upon learning these facts it disturbed him mentally and he decided he could not in good conscience and in accordance with his religious belief lawfully live with her and for this reason abandoned her, to acquit him, so far as his abandonment of his wife was concerned. In another that if his wife stated to him that when visiting in San Antonio she saw her former husband, and he did not know but learned afterwards who he was and she told him, she was tired of living with one man and intended to quit him and that he learned upon investigation that his wife visited her mother and her mother at the time or prior thereto conducted an assignation house, and that upon learning these facts he abandoned her, then he would not be guilty of wilfully and without justification abandoning her and to acquit him.

The court did not err in refusing his special charges. There is no evidence tending to show that his wife was other than a pure, chaste woman.

Our Constitution (art. 1, sec. 4) is that no religious test shall ever be required as a qualification to any office of public trust, nor that anyone shall be excluded from holding office on account of his religious sentiments. The next section provides that no person shall be disqualified to give evidence in any court on account of his religious opinions, or for want of any religious belief. The next section provides that everyone has a natural and indefeasible right to worship God according to the dictates of his own conscience, and that no human authorities are in any case whatever to control or interfere with the rights of conscience in matters of religion. In Haymond v. Haymond, 74 Texas, 414, Haymond sought a divorce against his wife, among other things, because a band of religious fanatics composed chiefly of women crept into his home, lodged in the bosom of his family, poisoned the atmosphere thereof, blighted his life, alienated his wife's affection, estranged his children and made desolate all that was once happy and comfortable, and other such like allegations as a ground for divorce. His wife specially excepted to all of these allegations as to her religious opinions and those of her mother. Our Supreme Court held: "In view of the constitutional provisions securing to 'all men the right to worship Almighty God according to the dictates of their own consciences,' and asserting that 'no human authority ought in any case whatever to control or interfere with the rights of conscience in matters of religion,' we do not think that questions as to the doctrines or practices of the sanctificationists ought to have been permitted to enter to any extent into the trial, and on objection they should have been eliminated from the pleadings and the evidence. It was defendant's right to have any religious belief, or none, as best suited her. If her conduct as a wife was such as to furnish her husband grounds for divorce, the acts themselves would be the only proper subjects of investigation, without any regard to the religious convictions that led to them. If her conduct was blameless it was useless to allege and prove that her religious connections inculcated evil views and practices." In 1 Bishop on Marriage, Divorce and Separation, section 1657, in discussing the religious dogma of the churches and especially that of the Roman Catholic Church, it says: "but the law of our several States takes no cognizance of dogma or of the interpretation of the scriptures made by any particular sect." In section 1762 it is said: "Vows made to an ecclesiastical superior or to God in pursuance of a religious faith have no more effect on our law than any other vows." Again, in section 1753, it is said: "The doctrine most favored in our American courts . affirms our proposition that . . . only the ill conduct which would authorize a judicial separation or dissolution (of the marriage) will justify a desertion."

Under these authorities, and in reason, appellant's membership in the Catholic church and its doctrines and his religious belief, or want of it, and the fact that his wife prior to her marriage to him had been legally married to another and divorced before she married him, and

the fact, if so, that her mother was of bad character and kept assignation houses, if she did, could not and would not justify appellant's abandonment of his wife or child and his refusal to support them or either of them, they being in either necessitous or destitute circumstances at the time.

We have deemed it unnecessary to take up separately appellant's assignments. We have considered them all. What we have said disposes of all of them and none of his assignments present any reversible error.

The judgment will therefore be affirmed.

*Affirmed.*

### ON REHEARING.

### June 28, 1918.

MORROW, JUDGE.—A part of the court's charge is as follows: "You are further instructed as the law applicable to this case, that the evidence introduced in the trial of this case as to the character or reputation of the mother of Mrs. Ida May Trial or of the reputation of any house or houses controlled by said mother, or of the religious belief or religious convictions of the defendant, Peter J. Trial, or any evidence tending to prove the failure of Mrs. Ida May Trial to inform defendant of her former marriage does not constitute a legal defense or justification of the offense of which the defendant stands charged, but such evidence shall be considered by you, if at all, in mitigation of the punishment if you find the defendant guilty of the commission of the offense charged as to the desertion of the defendant's wife, Ida May Trial, as charged in the first count of the information.

"You are further instructed that such evidence is not to be considered by you in mitigation or justification of offense charged as to the alleged desertion of defendant's child, Madeline Trial, as charged in the second count of the information.

"You are further instructed that the court has permitted the introduction of the evidence to show that the defendant in this case two days after the alleged offense of abandonment filed suit against his said wife for divorce, in which suit defendant asks and prays for custody of both his said children. The court has further permitted the introduction of testimony tending to show that in March, 1915, shortly after the alleged abandonment and on subsequent occasions thereafter made or caused to be made propositions to his said wife by which said child would be cared for and the necessities of said wife cared for. This evidence has been permitted to be introduced for the purpose of throwing light on the act of abandonment and to show the intention of the defendant at the time he abandoned his said wife and child. Now, therefore, if you believe from all of the evidence that the defendant at the time of the alleged abandonment and at all times since the alleged abandonment, made or attempted to make, in good faith, provisions

for the support of said wife and said child, then you should acquit the defendant."

There was a general verdict convicting appellant on an information containing two counts, one charging the wilful desertion of his wife, who was in destitute and necessitous circumstances, and without justificatior and the other making a similar charge with reference to his child.

Appellant complains of the part of the charge mentioned, and in testing the justice of his claim the evidence from his viewpoint must be considered. The charge should deal with issues raised by the evidence, leaving their solution, where the evidence is conflicting, to the jury. The evidence from appellant's standpoint went to show that at the time he married his wife she went under her maiden name, and that he was without knowledge of the fact that she had been previously married and divorced; that they were both members of the Catholic church; that he was informed by ministers of that religion and so believed that the marriage was illegal. There was also evidence that appellant's wife had been married and divorced, and that her sister had been divorced, and that her mother was a divorced woman and was engaged in the occupation of conducting an assignation house, and that the house she occupied at the time of the separation and other houses that she had previously occupied had the general reputation of assignation houses; that this business was conducted in the City of San Antonio. Appellant and his wife at the time of the separation lived at a point distant therefrom, and appellant, according to his testimony, learned of the character of the house that his wife's mother was keeping some four months prior to the separation. That he learned this while he and his wife were at her mother's house, the presence of various girls about the premises arousing his suspicions, and that he saw one of them in a compromising position with a visitor in the house, and upon investigation found out the character of the house, upon which he told his wife of what he had seen and did not care to have her visit there. That his wife replied that her mother was making money by obtaining from the girls in the house a division of their income. He also testified that his wife, after this information was given her and request made, continued to visit her mother. It appears also from her testimony that she did make visits to her mother. It was shown that while appellant's wife was in San Antonio, before she returned to her home on the occasion when the desertion is alleged to have taken place, that appellant made arrangements with a lawyer to bring suit against her for divorce, and to attain the custody and care of the child. This suit was filed about two days subsequent to the date of the alleged desertion. In it he did seek to obtain the care and custody of the child, charging that his wife was not a proper person to care for or have custody of the child.

The statute does not define the term "without justification." It manifestly leaves to the jury the determination of what facts will sustain the allegation that one wilfully and without justification deserted

his wife. This being true, I can not assent to the correctness of the proposition that the trial court was authorized to withdraw from the jury the facts recited in the charge quoted and inhibit their use of them in determining whether appellant's desertion was wilful, or whether it was without justification. The suggestion is made that his wife was not aware of the character of business that her mother was conducting. If appellant's testimony was true she was aware of it, for he claims to have told her. This she denied, but the court instructed the jury that the character or reputation of the mother of Mrs. Trial, or the house or houses she controlled, was not a matter that they could consider in determining appellant's guilt or innocence, but could be considered only in mitigation of his punishment. From the evidence the general reputation of the mother of Mrs. Trial and the character of house that she kept was well established. As we understand the basis upon which the general reputation is admitted, the fact that the house had the general reputation mentioned was itself some evidence of the knowledge of Mrs. Trial that such reputation existed. This we understand to be the rule laid down by Mr. Wharton in his work on Evidence, page 478, section 254, wherein he cites numerous cases supporting the text. If Mrs. Trial, knowing that her mother was keeping an assignation house, participating in the revenues derived therefrom, and living in the house herself, and with the knowledge of the fact that the house had the general reputation as such, persisted in becoming a frequenter of the house, we are not prepared to sanction the view that, as a matter of law, this would not be a circumstance that might be weighed by the jury in determining whether or not her husband, after protest of this conduct, was justified in her abandonment. In determining whether the desertion of his wife was wilful, it is my judgment that all of the matters which are catalogued in the court's charge and withdrawn from the jury, except as bearing upon the mitigation of punishment, were matters that the jury should have been left free to consider. The fact that many of them were controverted and on conflicting evidence might have been determined against appellant by the jury, does not militate against the force of the contention that under our practice they were evidence of facts which the jury alone had the right to disregard.

There are bills of exception showing the details of offers of compromise which were made by appellant and which are referred to in the charge of the court quoted. In one of these it appears that appellant offered to prove that he offered to take the two children to the home of his father, who was in prosperous circumstances, and who had authorized appellant to assure his wife that he would set aside sufficient property to guarantee that the proposal made by appellant would be carried into effect and the children cared for, educated, and each furnished with a thousand dollars at their majority. Another proposition was, in substance, that appellant's father would place the two children in a Catholic school in San Antonio, the little boy at the time, and the younger child when she attained suitable age, she to remain with her mother in

the meantime, and maintain them in school until they reached the age of twenty-one years, or so long as they would stay, or until the girl was married, and would give them each one hundred acres of land of the value of fifty dollars per acre, the appellant and his wife each having the privilege of visiting the children at their pleasure, subject to the observance of the rules of the school, and provide for them to spend their vacation with their parents, and appellant's wife to be furnished sufficient money to pay the necessary expenses to equip herself for teaching and school work. The court in qualifying these bills says that after sustaining the objection to the testimony, that the objection was withdrawn. It appears from the qualification that appellant's counsel claimed to have had no knowledge of this withdrawal, and the court says that he has no reason to doubt the truth of his statement. The bills show that the details mentioned were excluded and were never introduced, and from the charge quoted it appears that the learned trial judge regarded these offers as relevant on the question of intent, and in the charge so informed the jury. Being relevant upon that issue, it is manifest that the jury, having information only that a proposition had been made, and remaining in ignorance of its terms, or the circumstances under which it was made, was not in a position to determine its good faith, or measure its weight as they would have been had the evidence excluded been before them.

At the time appellant arranged to bring the suit for divorce and for the custody of his children, he and his wife were in San Antonio, where her father resided. Before the suit was filed she returned to her home and appellant abandoned her. He testified that, "When she came back to Hobson on the 11th of February I made provision for her support and maintenance while there. I told my father and my brother Joe to see that she was taken care of, and would get a way to go back to San Antonio." Mrs. Trial testified that after she learned that her husband intended to abandon her she went to his father's house. She said: "Old man Trial did not offer me the money. He told me to go to the hotel, and I told him I was afraid to go to the hotel, and he said he would pay for the hotel." She also said that appellant's brother gave her three dollars, which she used in returning money that she had borrowed with which to pay her way to San Antonio. Appellant offered evidence, in substance, to the effect that his wife's father lived in San Antonio and was in good circumstances, and offered other evidence from which the jury might infer that her father was willing that Mrs. Trial and her children should live in his household. It is doubtless true that appellant could not discharge his obligation to support his wife and children by proving that they could live upon the bounty of another. I am of the opinion, however, that under the circumstances this evidence should have been received for such use as the jury might see proper to make of it in determining whether or not the appellant had wilfully abandored his wife and children and left them in destitute or necessitous circumstances; at least in connection with other facts of the

case it might have had weight with the jury in mitigating the punishment. This conclusion is suggested in reading the report of cases construing the statute in question, among them Windham v. State, 80 Texas Crim. Rep., 551, 192 S. W. Rep., 248; Verse v. State, 81 Texas Crim. Rep., 48, 193 S. W. Rep., 303; Irving v. State, 73 Texas Crim. Rep., 615.

Because of the various matters referred to above I entertain the view that appellant's conviction is the result of a trial in which he was denied the legitimate use of facts bearing upon his conduct which might, if the jury had been permitted to receive and consider them, have brought about a different result. I, therefore, believe that the motion for rehearing should be granted, the affirmance set aside, and the judgment of the lower court reversed and remanded.

*Reversed and remanded.*

June 28, 1918.

PRENDERGAST, JUDGE (dissenting).—Appellant, in his motion for rehearing, complains of the court's statement of the testimony and what it was sufficient to establish. It may be stated in a general way that he contends the jury should have believed what he and some of his witnesses testified instead of believing, and basing their finding upon, the testimony of his wife and the other State's witnesses, and that this court should have stated the matter from his, and not the State's, standpoint.

All the testimony has again been read and considered. The statement of the testimony and the conclusions justified thereby were fully and correctly stated in the original opinion with one solitary exception. This was as to the distance from the depot to appellant's residence. In the opinion it was stated that this distance was from one-half to one mile. A critical examination of the statement of facts again shows that this distance, or what the distance was, is stated by no witness. But it was sworn that the distance from appellant's home to that of his father was about a mile. Appellant concedes, in his motion, that this court quite naturally fell into this error because the record shows that appellant's father lived something like a mile from the depot. However, this solitary mistake could not affect any question in the case. It was wholly immaterial what the distance was from the depot to appellant's residence. It has no possible bearing on any question in the case. Otherwise, the statement of the evidence and conclusions clearly justified thereby were accurate and fully stated in the original opinion.

The statute prescribing this offense was given in the original opinion. The gist of it will be given here again. It is: Any husband who shall wilfully desert, neglect or refuse to provide for the support and maintenance of his wife who is in necessitous circumstances; or any parent who shall desert, neglect or refuse to provide for the support and maintenance of his child under the age of 16 years who is in neces-

sitous circumstances, is guilty and shall be punished. The information herein, in separate counts, charged each of these offenses; that is, in one count applicable to the wife, and in the other count applicable to the little 6-weeks' old very sick child of appellant.

In order to make out the offense as to both or either it would be necessary to show that appellant wilfully deserted his wife, or child, as the case might be, and that he neglected or refused to provide for the support and maintenance of his wife or child and that they were at the time in necessitous circumstances. When this proof is made the case is made out and the jury are not only justified, but required, under the law to find him guilty and assess his punishment.

Now as to the proof of these particular facts.

It was frankly admitted by appellant, "it would be folly to argue that the evidence is not complete and convincing that appellant did desert his wife." The statute (art. 640c, Vernon's Crim. Stats.) expressly enacts that proof of the desertion of the wife or child in necessitous circumstances or of neglect or refusal to provide for their support and maintenance "shall be prima facie evidence that such desertion, neglect or refusal is wilful."

Mrs. Trial, his wife, swore: "We never had what I call a real quarrel. He never left the house without kissing me good-bye; never came without kissing me"; that just before his desertion they had not had a bit of trouble; that he wanted her to leave Hobson with him because "he said we could get along with his father better." "I always did everything that would please him; very devoted; exceedingly devoted. I never gave him any cause to treat me as he did treat me." She further swore that when she returned from her father's in San Antonio to her home in Hobson on February 11th with her very sick baby, "I did not have anything to eat in the house; I did not have one nickel. . . . . I had no money and had nothing in the house to eat; not a thing. I remained there in the house two days before I left," before returning to her father's in San Antonio after appellant had deserted her in the most cruel and heartless manner. She further swore: "During the time I stayed there my neighbors provided for me. Mrs. Rheinhardt brought me something to eat, and Mr. Moczygemba sent his daughter over with something; Jim Keiner and Ed. Keiner brought me something." These neighbors who testified bore her out in her testimony. She further swore, "While I was down there he did not send me any money or provisions or anything of the kind and he never came to see me; he did not come to see how the baby was getting along. Then I went to San Antonio and stayed until, I think it was, March 25th. During that time he never sent me a nickel; he never sent me provisions. . . . When I came back here on the 25th (of March) I asked for the support of the baby and the judge gave me $30 per month. Up to the order of the court he never made any provision for my support and had not sent me any money or provisions for the child. At the time he abandoned me I did not have any means of support. I

did not have a nickel. . . . From the time the trouble came up until I came back down here and this order was made in the court he never sent me anything for the child. My husband never sent me any money and never made any provision for me. . . . At the present time my means of support is this $30 per month. I have no other means of livelihood. I tried to get a certificate (to teach) but broke down and could not do it."

She further testified that while at San Antonio with her very sick infant child, and just before she returned to her home at Hobson on February 11th, she was greatly in need of a pair of shoes and 'phoned appellant for permission to buy a pair and have them sent to Hobson C. O. D. He refused to let her get the shoes. A day or two before February 11th he delivered to the local paper at Hobson a notice for publication, and which was published on February· 11th, just before Mrs. Trial reached Hobson, notifying the public that he would not be responsible for any accounts contracted by her. He repeated several times in his testimony that he had never informed his wife that he intended to abandon her before she returned from San Antonio on February . 11th. She swore she never had an intimation of his intended desertion of her until she was told by others, not by him, on February 11th. He swore: "I did not tell her after she came back to Hobson that I was going to quit her; I did not tell her when she left to go ·to San Antonio with the sick child that I was going to quit her. . . . I went up to the house and got custody of the little boy. I did not tell her then that I was going to quit her. I suppose there was not anything in the house for her to live on for I had not been in the house for a week. I went up there for the purpose of getting the little boy and I knew I was not coming back. I don't think there was anything there for her to eat. I had not been there for a week and I had not put anything there for a week. I had not furnished her anything. I did not offer her one dime. . . . I took those checks, making her believe I was going after the grips; I was leaving her with the impression that I was coming back. . . . I did not go in and see the baby that day. I did not go in and look at its condition. I did not send my wife any money while she was in San Antonio with the baby." He swore that on March 25th, when she applied to the trial court for an allowance of $30 per month for the support of herself and her children, "It is a fact that I had an attorney down here and fought just as hard as I could in this court to keep from paying her and those minor children $30 per month for their support." He swore that while he had made up his mind some four months before February 11th to desert his wife he had never told her so or intimated to her that such was his intention.

In his testimony in chief he testified that while his wife was in San Antonio, after the birth of her last child, and as understood while she was there with the sick baby in February, he denied writing any letters to her that he wanted her to come back to Hobson. After he had

left the stand the State, for the purpose of further crossing him on this point, had him take the stand and he reiterated that statement. Thereupon the State handed to him two letters to her which he admitted he wrote and signed and stated that both of them were written and signed after his last baby was born. One of them is as follows: "Dear Darlings: I arrived safe. I certainly was sleepy. . . . I am sending you the eggs and butter. I certainly am lonesome. I cried all the way to the depot. I must close. The train is due. Your devoted hubby and papa. Thousands of kisses to you and babies." (Signed) "Pete." In the other, evidently written much later, he wrote: "Darlings: I arrived all right. I am sending you eggs, cotton and Med. I am working in the store this evening. I will send you money so you can come home Sunday. With kisses and love to you and the babies. Your devoted hubby." (Signed) "Pete."

On and after February 11th he never at any time or at any place furnished her with any eggs, or butter, or cotton, or medicines, or money, or anything else on earth in the way of provisions or clothing, or any money by which she could procure any of the necessities of life. The small sum of $30 per month, which the court required him to furnish her after March 25th for her support and that of her babies, was furnished by him against his will, over his protest and earnest opposition. He says he told his father and brother to furnish her on the 11th, the very day he deserted her. Neither of them testified. He did not know what was done or said with reference thereto by either of them, as he was not present at any time when they did, or offered to do, anything. The testimony, without dispute, positively shows that all on earth his father ever offered to do for that woman on or about February 11th, when appellant so cruelly and heartlessly deserted her and his child, was to offer to pay her hotel bill for one night, and that was done to induce her to leave his residence, from which he had already ordered her away. And, as she declined to go, he called an officer and had the officer take her away from his residence. His brother did not furnish her anything at all to support her or her child at any time. All he did was to furnish her with $3.00 with which to buy a ticket to San Antonio so as to get her away from Hobson and appellant. At no time and in no way did he or his father or his brother or anyone for him furnish his wife or his infant child with anything whatever to support or maintain them.

Appellant closes his motion for a rehearing herein with this statement:

"We are willing to submit this case upon one proposition and one only; and that is, if this record does not show that this man attempted to provide for his wife and child from the very hour of the alleged desertion up until the hour of trial and conviction, then this judgment should be affirmed."

The evidence overwhelmingly establishes affirmatively that appellant at no time within a day or two from the time he cruelly and heart-

lessly deserted his wife and child provided one single solitary thing for their support and maintenance; that they were each and both so deserted by him and that they were each and both all the time, from the time of his desertion of them, in necessitous circumstances. This very question was submitted to the jury in the special charge requested by appellant and the jury found against him, as they should have found—could not legally otherwise have found.

Every question in the case was correctly decided against appellant in the original opinion. Under no circumstances should a rehearing be granted nor this case be reversed, but unquestionably under the law and justice and for humanity's sake, and for the sake of true womanhood and innocent babyhood, should this case be affirmed. I protest to the action of my associates herein.