TRIAL v. STATE.   (No. 4563.)

(Court of Criminal Appeals of Texas.  June 28, 1918.)

Appeal from Karnes County Court.

Dissenting opinion.

For majority opinion, see 205 S. W. 343.

PRENDERGAST, J.  Appellant, in his motion for rehearing, complains of the court's statement of the testimony and what it was sufficient to establish.  It may be stated in a general way that he contends the jury should have believed what he and some of his witnesses testified, instead of believing, and basing their finding upon, the testimony of his wife and the other state's witnesses, and that this court should have stated the matter from his, and not the state's, standpoint.

All the testimony has again been read and considered.  The statement of the testimony and the conclusions justified thereby were fully and correctly stated in the original opinion, with one solitary exception.  This was as to the distance from the depot to appellant's residence.  In the opinion it was stated that this distance was from one-half to one mile.  A critical examination of the statement of facts again shows that this distance, or what the distance was, is stated by no witness.  But it was sworn that the distance from appellant's home to that of his

father was about a mile. Appellant concedes, in his motion, that this court quite naturally fell into this error, because the record shows that appellant's father lived something like a mile from the depot. However, this solitary mistake could not affect any question in the case. It was wholly immaterial what the distance was from the depot to appellant's residence. It has no possible bearing on any question in the case. Otherwise, the statement of the evidence and conclusions clearly justified thereby were accurate and fully stated in the original opinion.

The statute proscribing this offense was given in the original opinion (205 S. W. 343). The gist of it will be given here again. It is: Any husband who shall willfully desert, neglect, or refuse to provide for the support and maintenance of his wife, who is in necessitous circumstances, or any parent who shall desert, neglect, or refuse to provide for the support and maintenance of his child under the age of 16 years, who is in necessitous circumstances, is guilty and shall be punished. The information herein, in separate counts, charged each of these offenses; that is, in one count applicable to the wife, and in the other count applicable to the little 6 weeks old very sick child of appellant. In order to make out the offense as to both or either, it would be necessary to show that appellant willfully deserted his wife, or child as the case might be, and that he neglected or refused to provide for the support and maintenance of his wife or child, and that they were at the time in necessitous circumstances. When this proof is made, the case is made out, and the jury are not only justified, but required, under the law to find guilt and assess punishment.

Now, as to the proof of these particular facts: It was frankly admitted by appellant:

"It would be folly to argue that the evidence is not complete and convincing that appellant did desert his wife."

The statute (article 640c, Vernon's Crim. Stats. [Pen. Code]) expressly enacts that proof of the desertion of the wife or child in necessitous circumstances or of neglect or refusal to provide for their support and maintenance "shall be prima facie evidence that such desertion, neglect, or refusal is willful." Mrs. Trial, his wife, swore:

"We never had what I call a real quarrel. He never left the house without kissing me good-bye; never came without kissing me." That just before his desertion they had not had a bit of trouble. That he wanted her to leave Hobson with him, because "he said we could get along with his father better." "I always did everything that would please him; very devoted; exceedingly devoted. I never gave him any cause to treat me as he did treat me."

She further swore:

That, when she returned from her father's in San Antonio to her home in Hobson on February 11th, with her very sick baby, "I did not have anything to eat in the house. I did not

have one nickel. * * * I had no money, and had nothing in the house to eat; not a thing. I remained there in the house two days before I left"—before returning to her father's in San Antonio, after appellant had deserted her in the most cruel and heartless manner.

She further swore:

"During the time I stayed there, my neighbors provided for me. Mrs. Reinhardt brought me something to eat, and Mr. Moczygemba sent his daughter over with something. Jim Keiner and Ed. Keiner brought me something."

These neighbors, who testified, bore her out in her testimony. She further swore:

"While I was down there he did not send me any money, or provisions, or anything of the kind, and he never came to see me. He did not come to see how the baby was getting along. Then I went to San Antonio and stayed until I think it was March 25th. During that time he never sent me a nickel; he never sent me provisions. * * * When I came back here on the 25th (of March) I asked for the support of the baby, and the judge gave me $30 per month. Up to the order of the court, he never made any provision for my support, and had not sent me any money or provisions for the child. At the time he abandoned me, I did not have any means of support. I did not have a nickel. * * * From the time the trouble came up, until I came back down here, and this order was made in the court, he never sent me anything for the child. My husband never sent me any money, and never made any provision for me. * * * At the present time my means of support is this $30 per month. I have no other means of livelihood. I tried to get a certificate [to teach], but broke down, and could not do it."

She further testified that while at San Antonio with her very sick infant child, and just before she returned to her home at Hobson on February 11th, she was greatly in need of a pair of shoes, and phoned appellant for permission to buy a pair and have them sent to Hobson C. O. D. He refused to let her get the shoes. A day or two before February 11th he delivered to the local paper at Hobson a notice for publication, and which was published on February 11th, just before Mrs. Trial reached Hobson, notifying the public that he would not be responsible for any accounts contracted by her. He repeated several times in his testimony that he had never informed his wife that he intended to abandon her before she returned from San Antonio on February 11th. She swore she never had an intimation of his intended desertion of her until she was told by others, not by him, on February 11th. He swore:

"I did not tell her, after she came back to Hobson, that I was going to quit her. I did not tell her, when she left to go to San Antonio with the sick child, that I was going to quit her. * * * I went up to the house and got custody of the little boy. I did not tell her then that I was going to quit her. I suppose there was not anything in the house for her to live on, for I had not been in the house for a week. I went up there for the purpose of getting the little boy, and I knew I was not coming back. I don't think there was anything there for her to eat. I had not been there for a week, and I had not put anything there for a week. I had not furnished her anything. I did not offer her one dime. * * * I took those checks, making her believe I was going after the grips. I was leaving her with

the impression that I was coming back. * * * I did not go in and see the baby that day. I did not go in and look at its condition. I did not send my wife any money while she was in San Antonio with the baby."

He swore that on March 25th, when she applied to the trial court for an allowance of $30 per month for the support of herself and her children:

"It is a fact that I had an attorney down here, and fought just as hard as I could in this court to keep from paying her and those minor children $30 per month for their support."

He swore that, while he had made up his mind some four months before February 11th to desert his wife, he had never told her so, or intimated to her that such was his intention. In his testimony in chief he testified that while his wife was in San Antonio, after the birth of her last child, and as understood while she was there with the sick baby in February, he denied writing any letters to her that he wanted her to come back to Hobson. After he had left the stand, the state, for the purpose of further crossing him on this point, had him take the stand, and he reiterated that statement. Thereupon the state handed to him two letters to her which he admitted he wrote and signed, and stated that both of them were written and signed after his last baby was born. One of them is as follows:

"Dear Darlings: I arrived safe. I certainly was sleepy. * * * I am sending you the eggs and butter. I certainly am lonesome. I cried all the way to the depot. I must close. The train is due. Your devoted hubby and papa. Thousands of kisses to you and babies. [Signed] Pete."

In the other, evidently written much later, he wrote:

"Darlings: I arrived all right. I am sending you eggs, cotton, and Med. I am working in the store this evening. I will send you money so you can come home Sunday. With kisses and love to you and the babies, your devoted hubby. [Signed] Pete."

On and after February 11th he never at any time or at any place furnished her with any eggs, or butter, or cotton, or medicines, or money, or anything else on earth in the way of provisions or clothing, or any money by which she could procure any of the necessities of life. The small sum of $30 per month, which the court required him to furnish her after March 25th for her support and that of her babies, was furnished by him against his will, over his protest and earnest opposition. He says he told his father and brother to furnish her on the 11th, the very day he deserted her. Neither of them testified. He did not know what was done or said with reference thereto by either of them, as he was not present at any time when they did, or offered to do, anything. The testimony, without dispute, positively shows that all on earth his father ever offered to do for that woman, on or about February 11th, when appellant so cruelly and heartlessly de-

serted her and his child, was to offer to pay her hotel bill for one night, and that was done, to induce her to leave his residence, from which he had already ordered her away; and, as she declined to go, he called an officer, and had the officer take her away from his residence. His brother did not furnish her anything at all to support her or her child at any time. All he did was to furnish her with $3 with which to buy a ticket to San Antonio, so as to get her away from Hobson and appellant. At no time and in no way did he, or his father, or his brother, or any one for him, furnish his wife, or his infant child, with anything whatever to support or maintain them.

Appellant closes his motion for a rehearing herein with this statement:

"We are willing to submit this case upon one proposition, and one only, and that is: If this record does not show that this man attempted to provide for his wife and child from the very hour of the alleged desertion up until the hour of trial and conviction, then this judgment should be affirmed."

The evidence overwhelmingly establishes affirmatively that appellant at no time, within a day or two from the time he cruelly and heartlessly deserted his wife and child, provided one single solitary thing for their support and maintenance, that they were each and both so deserted by him, and that they were each and both, all the time, from the time of his desertion of them in necessitous circumstances. This very question was submitted to the jury in the special charge requested by appellant, and the jury found against him, as they should have found—could not legally otherwise have found. Every question in the case was correctly decided against appellant in the original opinion. Under no circumstances should a rehearing be granted, nor this case be reversed, but unquestionably, under the law and justice, and for humanity's sake, and for the sake of true womanhood and innocent babyhood, should this case be affirmed.

I protest to the action of my Associates herein.